IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

COUNTRY BREEZE VENTURES, LLC,      *

     Plaintiff,                   *

vs.                                *        CASE NO. 4:18-CV-172 (CDL)

JORDAN OUTDOOR ENTERPRISES, LTD.,  *

     Defendant.                   *

_____

O R D E R

    Country Breeze Ventures, LLC ("Country Breeze") obtained an exclusive license to certain intellectual property owned by Jordan Outdoor Enterprises, Ltd. ("Realtree") for use on the packaging of its Realtree-branded energy drinks.  Country Breeze claims that Realtree breached the exclusivity provision of this license when it entered a licensing agreement with the Coca-Cola Company authorizing Coca-Cola to use Realtree intellectual property covered by the Country Breeze-Realtree exclusive license. Regrettably, the exclusivity provisions of the Country Breeze-Realtree License are ambiguous, and a genuine factual dispute exists as to the parties' contractual intent.  Accordingly, neither party is entitled to summary judgment on the breach of contract claims.  However, no genuine dispute exists on Country Breeze's fraudulent inducement claim, and Realtree's motion for summary judgment is granted as to that claim.

SUMMARY JUDGMENT STANDARD

Summary judgment may be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a *genuine* dispute of *material* fact exists to defeat a motion for summary judgment, the evidence is viewed in the light most favorable to the party opposing summary judgment, drawing all justifiable inferences in the opposing party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). A fact is *material* if it is relevant or necessary to the outcome of the suit. *Id.* at 248. A factual dispute is *genuine* if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. *Id.*

FACTUAL BACKGROUND

Realtree is a designer of camouflage patterns. Realtree licenses its intellectual property rights, including its trademarks and camouflage patterns, to businesses in exchange for license fees. Realtree entered such an agreement with J&M Concepts, LLC ("J&M"). The License Agreement was executed on June 15, 2011 and became effective January 1, 2013. It states, in relevant part:

1. J&M "is in the business of manufacturing the Licensed Products set forth on Schedule 'A'"—"Team Realtree Camouflage Beverages." Truong Decl. Ex. 1, License Agreement 1 & Schedule A (Jan. 1, 2013), ECF No. 28-4 at 2, 15.

2. J&M "desires to obtain a license for a limited term for the camouflage design(s) identified as Licensed Designs and Copyrights set forth on Schedule '1,' for the purpose of having said Licensed Products listed on Schedule 'A' decorated with the Licensed Design(s) set forth on Schedule '1.'" *Id.* at 1, ECF No. 28-4 at 2.

3. "Licensed Design" is defined as "the design(s) identified by and marketed under the Trademark(s) set forth on Schedule '1.'" *Id.* § 1.1.

4. "Copyright" is defined as "Copyright Registration(s) set forth on Schedule '1.'" *Id.* § 1.2.

5. "Trademark" is defined as "U.S. Trademark(s) set forth on Schedule '1.'" *Id.* § 1.3.

6. "Licensed Property" is defined as "the Copyright(s) and Trademark(s)" of Realtree. *Id.* § 1.5.

7. Realtree grants J&M "a License to use the Licensed Property and Copyright(s) in connection with the Licensed Products." *Id.* § 2.1.

8. J&M "shall not assign . . . its rights under this Agreement, the use of the Licensed property to third parties, except upon obtaining the prior written consent of" Realtree. *Id.* § 2.2, ECF No. 28-4 at 3; *accord id.* § 26.1, ECF No. 28-4 at 11 (stating that the Agreement "shall be assignable by [J&M] only with the prior written consent of [Realtree]").

9. J&M "has an exclusive on beverages for the term of this Agreement. Exclusive Beverages are defined as: Carbonated and Non-Carbonated Soft Drinks, Energy Drinks, Energy Shots, Tea's [sic], Enhanced Water, Flavored Water, Liquid Juices, and Liquid Coffee's [sic]. The term of the exclusive commences on the Effective Date (January 1, 2013) and will end on December 31, 2022." *Id.* Schedule A, ECF No. 28-4 at 15.

10. "The terms of this exclusive allows [sic] for all of Licensor's Marketing Agreements (Permission Agreements) and existing Licensee's [sic] prior to June 1, 2009 who currently manufactures [sic] products that are the same as the products identified as exclusive in this agreement to have their products and distribution channels grandfathered in." *Id.*

3

11.   Schedule 1 includes twelve trademarks, two filed trademark applications, ten copyrights, and twenty-eight licensed designs.  *Id.* Schedule 1, ECF No. 28-4 at 13.

12.   "This writing constitutes the entire Agreement between the parties hereto relating to the subject matter of this Agreement, including Schedule '1' and Schedule 'A,' and no term or provision of this Agreement shall be varied or modified by any prior or subsequent statement, conduct, or act of either of the parties except that any amendment to this Agreement must be in writing, specifically refer to this Agreement, and be executed by both parties in the same manner as this instrument."  *Id.* § 30.1, ECF No. 28-4 at 12.

During the negotiation process, before the License Agreement was executed, J&M asked Realtree for "a definition of 'exclusive.'" Truong Decl. Ex. 13, Emails between S. Bray & J. Thompson 2 (May 10 & 20, 2011), ECF No. 26-6 at 3.  Realtree responded that J&M's "exclusive has already been defined directly under the heading 'Exclusive Terms.'" *Id.* at 3, ECF No. 26-6 at 4.  Realtree also modified the "Exclusive Terms" as follows: "Licensee has an exclusive ~~to use the Team Realtree® logo~~ on beverages for the term of this agreement.  <u>Exclusive</u> Beverages are defined as Carbonated and Non-Carbonated Soft Drinks, Energy Drinks, Energy Shots, Tea's [sic], Enhanced Water, Flavored Water, Liquid Juices, and Liquid Coffee's [sic]."  *Id.* at 19, ECF No. 26-6 at 20 (addition underlined, stricken words strikethrough/italics).  J&M also told Realtree that it "would like assurance that there will not be competitive [Jordan Outdoor Energy] licensed beverages (eg Realtree Energy, Realtree OUtfitters Energy, etc.)."  *Id.* at 3,

ECF No. 26-6 at 4.   Realtree responded, "We have revised our exclusive language authorizing you for an exclusive on beverages. However, exclusive beverages are defined as Carbonated and Non-Carbonated Soft Drinks, Energy Drinks, Energy Shots, Tea's [sic], Enhanced Water, Flavored Water, Liquid Juices, and Liquid Coffee's [sic].   Therefore, you will have the exclusive on these specific beverages only; with the exception of those companies which have been grandfathered in."   *Id.*   A week later, Realtree sent J&M a letter stating that during the term of the License Agreement, "any requests received by Licensor from current or potential new Licensees or Authorized Manufacturers to add new products or branded logos in the beverages* category specific to Licensor's branded logos including but not limited to TEAM REALTREE® will be denied, excluding those requests received for use of Licensor's camouflage patterns and camouflage pattern logos to be used on packaging and/or containers."   Def.'s Mot. for Summ. J. Ex. C, Letter from N. Sweet to S. Bray (May 27, 2011), ECF No. 32-5.   The letter does not explain which licensed property is a "branded logo" and which is a "camouflage pattern logo."   J&M's chief financial officer signed an acceptance of terms stating that J&M agreed to the term.   *Id.*   But no language memorializing the term was added to the License Agreement.

In 2014, Realtree and J&M amended the License Agreement by executing an addendum that became effective October 1, 2014.   The

addendum updates Schedule A to describe the licensed products as "Team Realtree or Realtree w/ Antler Camouflage Beverages" and "Team Realtree or Realtree w/ Antler Camouflage Wine."  Truong Decl. Ex. 2, Addendum Schedule A, ECF No. 26 at 3.  It also contains an updated Schedule 1, which includes thirteen trademarks, thirteen copyrights, and twenty licensed designs.  *Id.* Addendum Schedule 1, ECF No. 26 at 5.  Under the License Agreement, J&M manufactured, marketed, and sold Team Realtree® and Realtree® branded energy drinks from January 1, 2013 to September 25, 2015.

In January 2015, Realtree entered a permission agreement with the Coca-Cola Company, granting Coca-Cola a license to use certain intellectual properties in connection with the packaging and marketing of Coca-Cola's Mello Yello carbonated soft drink.  Truong Decl. Ex. 7, 2015 Permission Agreement (Jan. 1, 2015), ECF No. 26-2.  Those intellectual properties included two trademarks, three copyrights, and four licensed designs, all of which are listed on Schedule 1 of the Realtree-J&M License Agreement.  *Id.* Attach. A, ECF No. 26-2 at 6.  Realtree informed J&M representatives of its interest in licensing certain intellectual properties to Coca-Cola, but a J&M representative testified that she was not informed of the Realtree-Mello Yello campaign until after it began and that J&M did not consent to it.  Kvamme Dep. 282:15-23, ECF No. 26-4 at 353-54.

In mid-2015, J&M began exploring the sale of its Realtree branded energy drink business to Country Breeze, which is led by Kimberly and James Willman.  J&M informed Country Breeze that it sold 259,849 cases of its beverages in 2013, 370,479 cases in 2014, and 141,533 cases between January and May 2015.  *See* Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. D, Realtree Brand Overview 25, ECF No. 43-6 at 28.  Based on the data J&M presented to Country Breeze, sales of J&M's Realtree energy drinks were lower in each month of 2015 compared to the same month in 2014.  *Id.*

J&M did not inform Country Breeze of the Realtree-Mello Yello campaign.  Representatives from Country Breeze, J&M, and Realtree met on September 10, 2015 to discuss the proposed sale of J&M's Realtree branded energy drink business to Country Breeze.  During the meeting, the exclusive license issue came up because "exclusivity of the license" was the "biggest selling point" and Country Breeze's "biggest concern" on buying the energy drink business from J&M.  K. Willman Sept. 26, 2017 Dep. 87:8-14, ECF No. 29-6.  James Willman testified that he "stood up in front of all of them" at the meeting "and said that's the reason why we are buying this company, because nobody else could be the camouflage – Realtree camouflage drink in the cooler door.  Neither one of them said nothing."  J. Willman Dep. 303:15-22, ECF No. 43-4.

After the September 10 meeting, J&M asked for Realtree's written consent to the assignment.  Truong Decl. Ex. 5, Letter

from M. Kvamme to Realtree (Sept. 11, 2015), ECF No. 28-8. Realtree's senior vice president of licensing signed an acknowledgment which stated, "The undersigned hereby consents to the assignment of the Agreement to which such undersigned is a party in connection with the" sale of J&M's assets to Country Breeze. *Id.*[1] On September 25, 2015, Country Breeze and J&M executed an asset purchase agreement for J&M's Realtree energy drink business, and J&M assigned the Realtree-J&M License Agreement to Country Breeze. Country Breeze began selling products pursuant to the License Agreement, and it was subject to the terms of the License Agreement, including the licensee's obligation to make royalty payments and submit certain reports to Realtree.

---

[1] Realtree argues that its consent to the assignment was a unilateral mistake and that its representative believed that a new contract between Realtree and Country Breeze would need to be executed and the old contract between Realtree and J&M would need to be terminated. A unilateral mistake may render a contract voidable only if, at the time of the contract, one party made a mistake as to a basic assumption on which he made the contract, the mistake has a material effect on the agreement, and the other party knew of the mistake or his fault caused it. *First Baptist Church of Moultrie v. Barber Contracting Co.*, 377 S.E.2d 717, 719 (Ga. Ct. App. 1989). "In some circumstances, equity will rescind a contract based on upon a unilateral mistake, but not where the party claiming mistake, by exercising reasonable diligence, could have discovered the truth." *Jenkins v. Sallie Mae, Inc.*, 649 S.E.2d 802, 805-06 (Ga. Ct. App. 2007) (footnotes omitted). Here, Realtree does not explain how the requirements for unilateral mistake are met or why it could not have discovered what its representative was consenting to by exercising reasonable diligence. Instead, Realtree seems to argue that its representative mistakenly executed the consent to the assignment when he should have taken steps to ensure that Country Breeze executed a new copy of the License Agreement so Realtree would have accurate records of who held a license to its intellectual property. This is not the type of mistake that would render the consent voidable.

Country Breeze projected that 350,000 cases of Realtree energy drink products would be sold in 2016 and that there would be a 2.5% increase in sales each year until 2022. Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. F, Pro Forma, ECF No. 43-8. That did not happen. The Realtree-Mello Yello campaign began in the fall of 2015, with Realtree's camouflage patterns and camouflage pattern logos appearing on Mello Yello bottles and cans. It is undisputed that all of the trademarks, copyrights, and licensed designs that were licensed to Coca-Cola for the Mello Yello campaign as part of the 2015 permission agreement are also listed on Schedule 1 of the October 1, 2014 addendum to the Realtree-J&M License Agreement. The Willmans believe that the Realtree-Mello Yello campaign led to declining sales of the Realtree energy drink products instead of increased sales as Country Breeze had projected.

Realtree asserts that sales of Realtree energy drink products declined before J&M sold the business to Country Breeze. Before Country Breeze purchased the energy drink business from J&M, sales of J&M's Realtree energy drinks were lower in each month of 2015 compared to the same month in 2014. Realtree Brand Overview 25, ECF No. 43-6 at 28. Realtree also pointed to evidence that other issues, like missing and damaged products, caused a decline in sales. But Country Breeze pointed to evidence that sales of its product dropped so dramatically after the Realtree-Mello Yello

campaign began that approximately half of Country Breeze's distributors terminated their relationships with Country Breeze due to "lack of sales." K. Willman Aug. 31, 2017 Dep. 63:7-13, ECF No. 28-12 at 75-76; *accord* J. Willman Dep. 95:22-97:3. The lower sales, in turn, meant that Country Breeze had to ship the product in partial pallets, which resulted in damaged product. J. Willman Dep. 192:6-194:20 (explaining how the damaged product "was all due to lack of -- loss of sales, because we couldn't send whole pallets"). Country Breeze also pointed to evidence that its Realtree energy drink products were more expensive and had less prominent store placement than the Realtree-Mello Yello soft drink "that has the pattern, that has the horns, that has everything that entails the Realtree brand." K. Willman Aug. 31, 2017 Dep. 168:20-169:14, ECF No. 28-12 at 201-02 (noting that convenience store customers who identify with the Realtree brand would see, at "eye level," Realtree branded Mello Yello for 99 cents or a dollar, compared with Country Breeze's "product for two for 3.33, or one for 2.99"); Gyimesi Dep. 175:1-176:18, ECF No. 26-5 at 219-21 (explaining how the Realtree brand resonates with a specific, brand-loyal audience and why packaging a soft drink in camo dress similar to the outdoor energy drink's container could cause customer confusion). Country Breeze's Realtree energy drink business ultimately failed.

It is undisputed that Country Breeze never made any royalty payments to Realtree.  According to Country Breeze, "sales dropped immediately" after September 2015, and Country Breeze "was trying to stay above water just to pay [its] employees."  J. Willman Dep. 293:5-9.  Country Breeze also never filed any royalty reports because it believed that Realtree "immediately breached the contract" after Country Breeze purchased the License Agreement from J&M.  *Id.* at 293:10-15.

## DISCUSSION

Country Breeze brought a breach of contract claim against Realtree, asserting that Realtree violated the exclusivity provision of the License Agreement by licensing its intellectual property to Coca-Cola for the Realtree-Mello Yello campaign. Country Breeze also brought a claim against Realtree for fraudulent inducement.  Realtree asserts a counterclaim against Country Breeze for breach of contract, contending that Country Breeze did not meet its obligations under the License Agreement.  Realtree seeks summary judgment on both of Country Breeze's claims and on its breach of contract counterclaim.  Country Breeze seeks partial summary judgment on its breach of contract claim.  The Court will address the breach of contract claims together, then the fraudulent inducement claim.

I.   **Breach of Contract Claims**

The parties agreed that the License Agreement would be governed by Georgia law.  Under Georgia law, a breach of contract claim requires (1) a contract, (2) breach of the contract, and (3) damages caused by the breach.  *See, e.g.*, *Norton v. Budget Rent A Car Sys., Inc.*, 705 S.E.2d 305, 306 (Ga. Ct. App. 2010).  Country Breeze claims that Realtree breached the License Agreement's exclusivity provision.  Realtree argues that it did not.  Whether Realtree breached the exclusivity provision hinges on the meaning of that provision.  Both Country Breeze and Realtree assert that the License Agreement's exclusivity provision is clear and unambiguous, but they argue that it means different things.

"The construction of a contract is a question of law for the court."  O.C.G.A. § 13-2-1.  But, "[w]here any matter of fact is involved, the jury should find the fact."  *Id.*  "The cardinal rule of construction is to ascertain the intention of the parties."  O.C.G.A. § 13-2-3.  "If that intention is clear and it contravenes no rule of law and sufficient words are used to arrive at the intention, it shall be enforced irrespective of all technical or arbitrary rules of construction."  *Id.*

Contract construction involves three steps.  "First, the court must decide whether the plain language of the contract is clear and unambiguous."  *Healthy-IT, LLC v. Agrawal*, 808 S.E.2d 876, 882 (Ga. Ct. App. 2017).  "If it is, the contract is enforced

as written according to its plain terms and no further construction is needed or allowed." *Id.* "However, if the language used in the contract is ambiguous, the court must apply the rules of contract construction to attempt to resolve any ambiguities." *Id.* "And if the ambiguities cannot be resolved by applying the rules of contract construction, then a jury must resolve the issue of what the ambiguous language means and what the parties intended." *Id.*

The Georgia courts define "ambiguity to mean duplicity, indistinctness, an uncertainty of meaning or expression used in a written instrument, and it also signifies being open to various interpretations." *Id.* (quoting *Shepherd v. Greer*, *Klosic & Daugherty*, 750 S.E.2d 463, 465 (Ga. Ct. App. 2013)). "Or to put it more simply, '[a] word or phrase is ambiguous when its meaning is uncertain and it may be fairly understood in more ways than one.'" *Id.* (alteration in original) (quoting *Freund v. Warren*, 740 S.E.2d 727, 730 n.4 (Ga. Ct. App. 2013)).

In this case, there is an ambiguity in the License Agreement because the exclusivity provision may be fairly understood in more than one way. It could mean, as Realtree argues, that Realtree granted an exclusive license for Country Breeze to use its "Team Realtree" and "Realtree w/ Antlers" licensed designs on the "Team Realtree or Realtree w/ Antler Camouflage Beverages," as well as a non-exclusive license to use any of the camouflage patterns and camouflage pattern logos listed on Schedule 1 on those beverages.

Under this interpretation, Realtree cannot allow another company to use the "Team Realtree" and "Realtree w/ Antlers" licensed designs on "beverages," but other licensees can use Realtree's other intellectual property, including camouflage patterns and camouflage pattern logos, on beverages.    But another fair interpretation is, as Country Breeze argues, that Realtree granted Country Breeze a license to all of the licensed property (copyrights, trademarks, and licensed designs listed on Schedule 1) for use in connection with "Team Realtree or Realtree w/ Antlers Camouflage Beverages," and that license is exclusive for "Exclusive Beverages" as they are defined in the License Agreements, except that pre-2009 licensees could continue to use the licensed property on such beverages.    Under this interpretation, Country Breeze can only use the licensed property (intellectual property listed on Schedule 1) in connection with its "Team Realtree or Realtree w/ Antlers Camouflage Beverages," but Realtree may not allow another company to use that licensed intellectual property on "Exclusive Beverages" unless that company is grandfathered in.

Having concluded that the plain language of the License Agreement's exclusivity provision is ambiguous, "the court must apply the rules of contract construction to attempt to resolve any ambiguities." *Healthy-IT, LLC*, 808 S.E.2d at 882.  Country Breeze contends that one of those rules requires the exclusivity provision

to be construed against Realtree as the drafter of the contract. The License Agreement, however, was the product of negotiation rather than a form agreement, and both parties had opportunities to contribute to the substance of the agreement, including the exclusivity provision.   Thus, this rule of construction is unhelpful.   Although the parties pointed to no other canons of contract construction, the Court considered the statutory rules listed in O.C.G.A. § 13-2-2 for "arriving at the true interpretation of contracts."   They likewise do not resolve the ambiguity.

Given that the contract remains ambiguous after consideration of the interpretive canons, the Court may consider extrinsic evidence to ascertain the parties' contractual intent.   *Gans v. Ga. Fed. Sav. & Loan Ass'n*, 347 S.E.2d 615, 618-19 (Ga. Ct. App. 1986).   Each party argues that its extrinsic evidence supports the party's interpretation of the agreement.

Country Breeze presented evidence that during the negotiation process, J&M wanted to nail down what the "exclusive" provision meant.   Emails between S. Bray & J. Thompson 2 (May 10 & 20, 2011), ECF No. 26-6 at 3.   Realtree responded that the exclusive was already defined, and it sent a redline of the "Exclusive Terms" that said: "Licensee has an exclusive ~~to use the Team Realtree®~~ ~~logo~~ on beverages for the term of this agreement.   <u>Exclusive</u> Beverages are defined as Carbonated and Non-Carbonated Soft

Drinks, Energy Drinks, Energy Shots, Tea's [sic], Enhanced Water, Flavored Water, Liquid Juices, and Liquid Coffee's [sic]." *Id.* at 19, ECF No. 26-6 at 20 (addition underlined, stricken words strikethrough/italics). Thus, an earlier draft of the License Agreement stated that J&M had an exclusive to use the Team Realtree logo; had that language remained in the License Agreement, it would have been clear that the exclusive was limited to the Team Realtree logo and did not extend to any other licensed property on Schedule 1. But Realtree removed the words "to use the Team Realtree® logo," which could be read as meaning that it did not intend to limit the exclusive to the Team Realtree® logo. In addition, when J&M sought assurances that there would "not be competitive [Jordan Outdoor Energy] licensed beverages (eg Realtree Energy, Realtree OUtfitters Energy, etc.)," Realtree responded that it authorized J&M "for an exclusive" on specific types of beverages. *Id.* at 3, ECF No. 26-6 at 4. Realtree explained that J&M "will have the exclusive on these specific beverages only; with the exception of those companies which have been grandfathered in." *Id.* This response can be read as meaning that Realtree promised an exclusive on the licensed property for specific beverages.

Realtree presented evidence that it sent J&M a letter stating that during the term of the License Agreement, "any requests received by Licensor from current or potential new Licensees or Authorized Manufacturers to add new products or branded logos in

the beverages* category specific to Licensor's branded logos including but not limited to TEAM REALTREE® will be denied, excluding those requests received for use of Licensor's camouflage patterns and camouflage pattern logos to be used on packaging and/or containers." Letter from N. Sweet to S. Bray (May 27, 2011). Although this term was not added to the License Agreement, the letter suggests that Realtree intended—and J&M knew—that the scope of the exclusive would be limited to "branded logos" and would not extend to other licensed designs like camouflage patterns and camouflage pattern logos. But the letter does not define which licensed property is a "branded logo" and which is a "camouflage pattern logo," so it does not conclusively resolve the ambiguity of which specific copyrights, trademarks, and licensed designs are covered by the exclusive license.

A genuine factual dispute exists as to the extrinsic evidence and its effect on the resolution of the contract ambiguity and the determination of the parties' intent. The present record does not permit the Court as a matter of law to determine the true intention of the parties regarding which specific copyrights, trademarks, and licensed designs were exclusively licensed to J&M/Country Breeze for use on "beverages" and which ones J&M/Country Breeze only received a non-exclusive license to use. A jury must decide the issue.

Realtree argues that even if a jury could conclude that the Realtree-Mello Yello campaign amounted to a breach of the License Agreement, Country Breeze cannot recover on a breach of contract claim for two additional reasons: (1) Country Breeze did not perform its obligation to pay royalties under the License Agreement and (2) Country Breeze cannot prove damages caused by the Realtree-Mello Yello campaign.  There is also a genuine fact dispute on these issues.  Country Breeze pointed to evidence from which a reasonable juror could conclude that it lost sales because of the similarly packaged Mello Yello, which was less expensive and had a more prominent placement in convenience stores.  Country Breeze also pointed to evidence from which a reasonable juror could find that the lost sales were so significant that Country Breeze could not make the minimum royalty payments.  "If the nonperformance of a party to a contract is caused by the conduct of the opposite party, such conduct shall excuse the other party from performance." O.C.G.A. § 13-4-23.  Accordingly, if the jury determines that the Realtree-Mello Yello campaign was a breach of the License Agreement, it could also conclude that Country Breeze could not make the royalty payments due to lack of sales of its energy drink products and that the lack of sales was caused by the Realtree-Mello Yello campaign.  Both summary judgment motions regarding the breach of contract claims are denied.

## II.  Fraudulent Inducement Claim

In addition to its breach of contract claim, Country Breeze asserts that Realtree fraudulently induced it to enter the asset purchase agreement with J&M and become the licensee under the License Agreement.  Country Breeze "must prove five elements in order to establish the fraud: (1) a false representation made by the defendant; (2) scienter; (3) an intention to induce the plaintiff to enter into a contract based upon the false representation; (4) justifiable reliance by the plaintiff; and (5) damage to the plaintiff as a result of the fraud." *Pinnock v. Kings Carlyle Club Apartments, LLC*, 819 S.E.2d 515, 518 (Ga. Ct. App. 2018).  Here, Realtree made no representations to Country Breeze regarding the License Agreement.  Instead, Country Breeze asserts that Realtree representatives who were at the September 10, 2015 meeting with Country Breeze and J&M knew that the exclusivity of the license was Country Breeze's "biggest concern" in buying the energy drink business from J&M, *see* K. Willman Sept. 26, 2017 Dep. 87:8-14, and that Country Breeze was buying the business "because nobody else could be the camouflage – Realtree camouflage drink in the cooler door."  J. Willman Dep. 303:15-22. These statements could be construed as putting Realtree on notice that Country Breeze believed it was getting an exclusive license to use Realtree's logos and camouflage patterns on energy drinks

and soft drinks.   Neither Realtree nor J&M corrected that impression or disclosed the Realtree-Mello Yello campaign.

"Suppression of a material fact which a party is under an obligation to communicate constitutes fraud.  The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." O.C.G.A. § 23-2-53.   There is no contention that Realtree and Country Breeze were in a confidential relationship.   Thus, Realtree's failure to correct Country Breeze's understanding of the License Agreement or disclose the Realtree-Mello Yello campaign only amounted to fraud if the particular circumstances of the case required Realtree to communicate this information.  Such "particular circumstances" only exist if (1) Realtree intentionally concealed a fact (2) "for the purpose of obtaining an advantage or benefit." *Ga. Real Estate Comm'n v. Brown*, 262 S.E.2d 596, 597 (Ga. Ct. App. 1979) (holding that the trial court did not err in reversing the Georgia Real Estate Commission's suspension of an agent's real estate license based on her failure to inform a lender that a check for additional earnest money had bounced because there was no evidence of intent to deceive and no evidence of any beneficial purpose to the agent).

Here, even if Realtree understood from James Willman's comments that Country Breeze believed it would receive an exclusive license to all of the intellectual property listed on Schedule 1

of the License Agreement and then Realtree intentionally concealed its own interpretation of the License Agreement's exclusivity provision and the Realtree-Mello Yello campaign, Country Breeze did not point to evidence that Realtree did so for the purpose of obtaining an advantage or benefit.  Country Breeze argues that Realtree remained silent to ensure that it would receive at least $75,000 per year in royalty payments from Country Breeze.  But the License Agreement required J&M to make minimum royalty payments of at least $75,000 per year, so if Country Breeze had not entered the asset purchase agreement, then J&M still would have had an obligation to make at least the minimum royalty payments.  Country Breeze did not point to evidence suggesting that Realtree would have been harmed if J&M's deal with Country Breeze had fallen through.   A reasonable jury could not conclude from the present record that Realtree was any better off because of Country Breeze's transaction with J&M.  Because Country Breeze has failed to point to any evidence that Realtree obtained an advantage by remaining silent, it had no legal duty to communicate its interpretation of the License Agreement or the Realtree-Mello Yello campaign. Without such a duty, Country Breeze's fraudulent inducement claim fails.[2]

---

[2] Country Breeze acknowledges that two of the remedies it seeks would only be available if it prevailed on its fraudulent inducement claim: disgorgement of profits and punitive damages.  Such remedies are not recoverable under a breach of contract theory, so Country Breeze will not be permitted to pursue them at trial.

CONCLUSION

As discussed above, Country Breeze's summary judgment motion (ECF No. 28) is denied.  Realtree's summary judgment motion (ECF Nos. 29 & 32) is granted as to Country Breeze's fraudulent inducement claim but otherwise denied.  This action will be placed on the calendar for the Court's September trial term.  The notice of pretrial conference will be issued in the summer.

IT IS SO ORDERED, this 15th day of April, 2020.

S/Clay D. Land
CLAY D. LAND
CHIEF U.S. DISTRICT COURT JUDGE
MIDDLE DISTRICT OF GEORGIA